IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AARYN NYJJIRH LOFTON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-4284 |
| Commissioner of Social Security | : | |

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                                       February  14, 2023

     Aaryn Nyjjirh Lofton ("Plaintiff") seeks review of the Commissioner's decision

denying his application for supplemental security income ("SSI").  For the reasons that

follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not

supported by substantial evidence.  Because the record is complete and supports a finding

of disability and further development/consideration of the record would serve no purpose,

I will remand the case for an award of benefits.

## I.     PROCEDURAL HISTORY

     Plaintiff received SSI based on his disability as a child, having been found

disabled on June 1, 2004, when he was 8 years old.  See tr. at 85 (Cessation or

Continuance of Disability or Blindness Determination and Transmittal noting disability

began on June 1, 2004).  However, once Plaintiff reached 18 years of age on June 8,

2013, and an updated assessment was made consistent with the Commissioner's

procedures, it was determined that he was not disabled as of October 2013, utilizing the

definition of disability applicable to adults, and his SSI payments ceased at the end of

December 2013.  Tr. at 85-88, 89-92; see also 20 C.F.R. §  416.987 (rules governing

disability redeterminations for individuals who attain age 18); 42 U.S.C.

§ 1382c(a)(3)(H)(iii) (requiring use of criteria for determination of initial eligibility for

adults in redetermining eligibility when a recipient reaches 18 years of age).  Plaintiff

was also denied benefits on reconsideration, tr. at 113-15, and he requested an

administrative hearing, id. at 116-18, which took place on July 13, 2016.  Id. at 32-72.[1]

On October 19, 2016, the ALJ found that Plaintiff was not disabled.  Id. at 18-26

(repeated id. at 462-70).  On November 22, 2017, the Appeals Council denied Plaintiff's

request for review.  Id. at 1-3 (repeated id. at 475-78).  On appeal to this court (Civ. No.

18-335), the Honorable Mitchell S. Goldberg, to whom the case was assigned, granted

Defendant's uncontested motion for remand.  Id. at 480-83, 486-87 (repeated id. at 911).

On remand, the Appeals Council vacated the earlier decision and remanded the

case for further evaluation of Plaintiff's mental impairments, a new residual functional

capacity ("RFC") assessment, and supplemental vocational testimony.  Tr. at 493-95.

The ALJ held an administrative hearing on December 19, 2019, id. at 416-58, and on

January 29, 2020, issued a decision finding that Plaintiff was not disabled.  Id. at 396-409

(repeated id. at 918-31).[2]  On appeal to this court (Civ. No. 20-2422), I granted

---

[1]The ALJ convened the hearing on February 5, 2015, but continued it to give
Plaintiff the opportunity to obtain counsel.  Tr. at 75-84.  Plaintiff was still unrepresented
at the July 13, 2016 hearing.  Id. at 34.

[2]Because Plaintiff did not file exceptions to the Appeals Council, nor did the
Appeals Council initiate its own review, the ALJ's January 24, 2020 decision became the
final decision of the Commissioner.  20 C.F.R. § 416.1484(a) (review of cases remanded
by court).

Defendant's uncontested motion for remand on September 21, 2020.  Id. at  938-40.[3]  The

Appeals Council vacated the prior decision and remanded the case to an ALJ for further

consideration of the non-treating source opinion, further evaluation of Plaintiff's mental

impairments and RFC, and to obtain additional vocational testimony if necessary.  Id. at

943-45.

On remand, a different ALJ held an administrative hearing on May 11, 2021, tr. at

873-910, and on May 26, 2021, found that Plaintiff was not disabled.  Id. at 851-66.

Without exceptions by Plaintiff or the Appeals Council initiating its own review, the

ALJ's May 26, 2021 decision became the final decision of the Commissioner.  20 C.F.R.

§ 416.1484(a).  This appeal followed, see Doc. 1 (Complaint), and the matter is now fully

briefed and ripe for review.  Docs. 6-8.[4]

## II.   **LEGAL STANDARD**

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.     Whether the claimant is currently engaged in
> substantial gainful activity;

---

[3]The parties had consented to magistrate jurisdiction.  Tr. at 939 n.2.

[4]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal
Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 4.

2.      If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;

3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

5.      If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere

4

scintilla." <u>Zirnsak</u>, 777 F.2d at 610 (quoting <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552

(3d Cir. 2005)); <u>see</u> <u>also</u> <u>Biestek v. Berryhill</u>, __ U.S. __, 139 S. Ct. 1148, 1154 (2019)

(substantial evidence "means only – 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion'") (quoting <u>Consol. Edison Co. v. NLRB</u>, 305

U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  <u>Schaudeck</u>, 181

F.3d at 431.

## III.   <u>DISCUSSION</u>

### A.   <u>ALJ's Findings and Plaintiff's Arguments</u>

The ALJ found that Plaintiff suffers from the severe impairments of bipolar

disorder, schizoaffective disorder, personality disorder, depression, mood disorder,

attention deficit hyperactivity disorder ("ADHD"), and borderline intellectual

functioning.  <u>Tr.</u> at 854.  In addition, the ALJ found that Plaintiff suffers from the non-

severe impairments of migraine without aura, facial swelling, left shoulder pain, and STD

exposure.  <u>Id.</u>  The ALJ next found that Plaintiff's impairments did not meet or equal the

listings of impairments, <u>id.</u>, and that Plaintiff retained the RFC to perform work at all

exertional levels with the following nonexertional limitations:  simple, repetitive tasks

with a 1-2 reasoning level; occasional changes in the work setting, and occasional contact

with the public and coworkers.  <u>Id.</u> at 857.  Based on the testimony of a vocational expert

("VE"), the ALJ determined that Plaintiff could not return to his prior work in security at

a casino, but could perform the jobs of dog bather, stable attendant, and laborer, and was

therefore not disabled.  <u>Id.</u> at 864-66.

Plaintiff claims that the ALJ erred in (1) considering the opinion evidence, including failing to incorporate limitations found by Ely Sapol, Ph.D., whose opinion the ALJ gave "great weight," relying on outdated opinions, and rejecting the opinion of consultative examiner Brook Crichlow, Psy.D., for improper reasons, and (2) failing to resolve conflicts between the VE testimony and the Dictionary of Occupational Titles ("DOT").  Doc. 6 at 4-13; Doc. 8 at 1-6.  Plaintiff also challenges the appointment of the former Commissioner of Social Security.  Doc. 6 at 16-18; Doc. 8 at 7-11.  Finally, Plaintiff argues that remand for an award of benefits is the proper remedy considering the delay in the case and the development of the record.  Doc. 6 at 14-15; Doc. 8 at 6. Defendant responds that substantial evidence supports the ALJ's consideration of the opinion evidence and that there are a significant number of jobs in the national economy that Plaintiff can perform despite an error in the identification of jobs corresponding with the ALJ's hypothetical.  Doc. 7 at 3-9.  In addition, Defendant argues that the appointment argument does not entitle Plaintiff to remand and that a remand for the award of benefits is not warranted.  Id. at 9-21.

### B.    Plaintiff's Claimed Limitations

Plaintiff was born on June 8, 1995, and was 18 years old in October 2013 when his child's benefits ceased and he was found not disabled utilizing the standards applicable to the determination of adult disability.  Tr. at 85.  Plaintiff was 21 at the time of the first ALJ decision (October 19, 2016); 24 at the time of the second ALJ decision (January 29, 2020); and two weeks shy of his 26th birthday at the time of the ALJ decision under

review (May 26, 2021).  Plaintiff completed the twelfth grade in special education classes and has past relevant work as a security officer in a casino.  Id. at 881-82, 884-85.

### C.   Medical Evidence

As a child, Plaintiff received SSI benefits based on a primary diagnosis of ADHD.[5]  Tr. at 85; see also id. at 293 (noting diagnosis of ADHD in 2004).  The records also indicate that Plaintiff was diagnosed with anxiety and a mood disorder prior to his eighteenth birthday.  Id. at 293.  Plaintiff's individualized education plan ("IEP") dated November 19, 2013, prepared for his senior year of high school shortly after he turned 18, indicated that his math skills were at a second grade level and literacy was at a third grade level.  Id. at 227, 229; see also id. at 887 (mother's testimony that he functioned at a third grade level).

At the time of the Disability Redetermination Decision, there was little evidence in the record beyond the IEP and the diagnoses mentioned.  On September 6, 2013, Dr. Sapol conducted a consultative examination at which Plaintiff was accompanied by his mother.  Tr. at 339-42.  Plaintiff's mother reported that Plaintiff had an IEP based on behavioral and learning problems, that the behavior problems stemmed from difficulties managing his anger, and that he was placed at his then-current school based on his

---

[5]"The essential feature of [ADHD] is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development.  Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"), at 85.  The DSM-IV-TR was replaced in 2013 with the Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM 5").  I will refer to the version of the DSM current at the time of Plaintiff's diagnosis/treatment.

behavioral problems.  Id. at 340.  Plaintiff reported that he gets irritated easily.  Id. at 341.

Based on his examination, Dr. Sapol concluded that Plaintiff suffered from disruptive

behavior disorder,[6] had problems with anger management, and had a Global Assessment

of Functioning ("GAF") score of 60.[7]  Id. at 342.  In the accompanying Medical Source

Statement, the doctor found that Plaintiff had mild limitation in his abilities to

understand, remember, and carry out simple instructions, and moderate limitation in his

abilities to understand, remember, and carry out complex instructions, and make

judgments on both simple and complex work-related decisions.  Id. at 344.[8]  The doctor

---

[6]In the DSM 5, disruptive behavior disorder is included in disruptive, impulse-control, and conduct disorders.  The unspecified disruptive, impulse-control and conduct disorder category "applies to presentations in which symptoms characteristic of a disruptive, impulse-control, and conduct disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not mee the full criteria for any of the disorders in the disruptive, impulse-control, and conduct disorders diagnostic class."  DSM 5 at 480.

[7]The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  DSM-IV-TR at 32.  A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect, circumstantial speech, occasional panic attacks) [or] moderate difficulty in school, social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers."  Id. at 34.  The DSM 5 eliminated reference to the GAF score.  However, the Commissioner continues to receive and consider GAF scores in medical evidence, see Administrative Message-13066 (July 22, 2013), and an ALJ must consider a GAF score with all of the relevant evidence in the case file.  Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa. 2016).

[8]The form utilized a 5-point scale:  "None" meant "[a]bsent or minimal limitations," "Mild" meant "[t]here is a slight limitation in this area, but the individual can generally function well," "Moderate" meant "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily," "Marked" meant "[t]here is a serious limitation in this area [-] a substantial loss in the ability to effectively function," and "Extreme" meant "[t]here is major limitation in this area [-] no useful ability to function in this area."  Tr. at 344.

also found that Plaintiff had moderate limitation in his abilities to interact with the public, supervisors, and coworkers, and respond appropriately to usual work related situations and changes in routine.  Id. at 345.

On September 27, 2013, John Gavazzi, Psy.D., concluded after conducting a records review that Plaintiff suffered from personality disorder, NOS (not otherwise specified),[9] resulting in mild limitation in his activities of daily living ("ADLs"), and moderate limitation in maintaining social functioning, and maintaining concentration, persistence, or pace, with no repeated episodes of decompensation.  Tr. at 311, 318, 321. Dr. Gavazzi found that Plaintiff was moderately limited in the abilities to understand, remember, and carry out detailed instructions, interact with the general public, and accept instructions and respond appropriately to criticism from supervisors.  Id. at 308-09.[10]

A few months later, on December 19, 2013, Peter Garito, Ph.D., also conducted a records review and found that Plaintiff suffered from a learning disorder and disruptive behavior disorder, resulting in mild limitation in his ADLs, moderate limitation in maintaining social functioning and maintaining concentration, persistence, or pace, and

---

[9]Personality disorder, NOS, also known as unspecified personality disorder, includes instances where "the individual's personality pattern meets the general criteria for a personality disorder, but the individual is considered to have a personality disorder that is not included in the [ten listed types in the] DSM 5 classification."  DSM 5 at 645-46.  "A personality disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, [and] is pervasive and inflexible."  Id. at 645.

[10]Despite finding Plaintiff "Moderately Limited" in the ability to understand, remember, and carry out detailed instructions, in his narrative assessment, Dr. Gavazzi stated that Plaintiff "is incapable of understanding and remembering complex or detailed instructions."  Tr. at 310.

no repeated episodes of decompensation.  Tr. at 325-26, 332, 335.  Dr. Garito found that

Plaintiff was moderately limited in his abilities to understand, remember, and carry out

detailed instructions, maintain attention and concentration for extended periods, get along

with coworkers or peers without distracting them or exhibiting behavioral extremes, and

the ability to respond appropriately to changes in the work setting.  Id. at 349-50.[11]

Plaintiff began treatment with Community Council Health Systems ("Community

Council") on September 24, 2014, to address symptoms of depression and problems

completing his ADLs, at which time both Plaintiff and his mother reported that Plaintiff

has trouble completing basic activities like cooking and cleaning and that even with

prompting he "never seems to consistently or correctly complete tasks."  Tr. at 377.

Plaintiff reported being unable to do more than two things at a time without getting

confused, and he was aware of his mood issues.  Id. at 381.  Therapist Benjamin Barnes,

M.A., diagnosed Plaintiff with mood disorder, NOS,[12] and a learning disorder.  Id. at

381-82.  On October 27, 2014, Brian Bora, M.D., noted that Plaintiff had mild depressive

symptoms for which he suggested a regular exercise regimen, and reading classes to

improve his literacy.  Id. at 375.  Dr. Bora also suspected borderline intellectual

---

[11]Despite finding Plaintiff "Moderately Limited" in the ability to maintain
attention and concentration for extended periods, tr. at 349, Dr. Garito noted in the
narrative that Plaintiff "is able to maintain concentration and attention for extended
periods of time."  Id. at 351.

[12]Mood Disorder NOS describes "mood symptoms that do not meet the criteria for
any specific Mood Disorder and in which it is difficult to choose between Depressive
Disorder [NOS] and Bipolar Disorder [NOS] (e.g., acute agitation)."  DSM-IV-TR at
346.  The DSM-IV-TR's section on Mood Disorders has been replaced in the DSM 5
with separate sections for Bipolar Disorders and Depressive Disorders.

functioning[13] based on Plaintiff's difficulties completing job applications, id., and assessed Plaintiff with a GAF of 47.[14] Id. at 376. On November 26, 2014, Plaintiff's mother accompanied him to the appointment with Dr. Bora and reported that that Plaintiff had behavioral issues at home and was getting in trouble with other children in their housing complex. Id. at 372. She also stated that when Plaintiff gets angry, he punches holes in the wall. Id.

On January 8, 2015, physicians' assistant ("PA") Kathleen Franks noted diagnoses of mood disorder, NOS, learning disorder, and borderline intellectual functioning. Tr. at 369. Plaintiff's mother stated that he "flips out all the time," and has broken things, knocked things off the table, and punched the wall. Id. Ms. Barnes assessed Plaintiff with a GAF of 55, noted that she was starting Plaintiff on a mood stabilizer, and prescribed Depakote and Vistaril.[15] Id. at 370. Two weeks later, although Plaintiff's

---

[13]Borderline intellectual functioning is a condition that may be the focus of clinical attention, characterized by an IQ score in the 71-84 range, and was distinguished from the classes of mental retardation that were characterized by an IQ score below 70. DSM-IV-TR, at 49, 740. The DSM 5 adopted the term intellectual disability in place of mental retardation. DSM 5 at 809. The four levels of severity (mild to profound) generally correspond to the prior severity levels, although there is now greater emphasis on adaptive functioning. Id. at 33, 809. Borderline intellectual functioning remains listed in the DSM 5 in the codes for other conditions that may be the focus of clinical attention but is not addressed in the relevant text. Id. at 716-17, 879.

[14]A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

[15]Depakote is used to treat various types of seizure disorders and is also used to prevent migraine headaches, or to treat manic episodes related to bipolar disorder. See https://www.drugs.com/depakote.html (last visited Feb. 1, 2023). Vistaril acts as an

aggression had decreased somewhat after starting medication, Plaintiff reported hearing voices directing him to stare at the wall or get up from a chair.  Id. at 366 (1/21/15).

On February 4, 2015, PA Franks noted that Plaintiff had thrown a bike at the wall, of which he had no recollection, and that his mother had to lock him in his room because "he was out of control and she could not have him out with the younger children."  Tr. at 363.  PA Franks added Seroquel[16] to Plaintiff's regimen.  Id. at 364.  On February 26, 2015, Plaintiff reported that he continued to hear voices giving him commands and PA Franks increased the dosage of Seroquel.  Id. at 360-61.  In March 2015, Plaintiff felt discouraged that the medication was not working as he still had episodes of anger and was hearing voices, but was not taking Depakote as prescribed.  Id. at 358.  In May, Plaintiff reported running out of medication and had experienced an increase in audible hallucinations and change in his mood, but before running out he noted improvement in his mood and decreased hallucinations.  Id. at 355.

On November 17, 2015, PA Franks noted that Plaintiff reported getting angry, punching walls, and having no memory of the event, and having continued audible hallucinations and visual hallucinations when watching television.  Tr. at 387.  PA Franks increased Plaintiff's Depakote and diagnosed him with schizophrenia[17] and borderline

---

antihistamine and is used as a sedative to treat anxiety and tension.  See https://www.drugs.com/vistaril.html (last visited Feb. 1, 2023).

[16]Seroquel is an antipsychotic used to treat schizophrenia and bipolar disorder. See https://www.drugs.com/seroquel.html (last visited Feb. 1, 2023).

[17]"The characteristic symptoms of schizophrenia involve a range of cognitive, behavioral, and emotional dysfunctions, but no single symptom is pathognomonic of the disorder."  DSM 5 at 100.  Symptoms of clear presence of delusions, hallucinations, or

intellectual functioning.  Id.  On April 4, 2016, Estela Beale, M.D., observed, "[h]e seems clueless.  He spends most of his time playing video games.  He appear[s] of limited intellectual capacity.  A training program for youngsters with disability may [be] indicated."  Id. at 389.[18]

On June 6, 2016, David Frankel, M.D., noted that Plaintiff was less agitated, but continued to experience psychotic symptoms and was unable to sleep.  Tr. at 384.[19]  The doctor increased Plaintiff's dosages of Depakote and Seroquel, and added trazodone.[20] Id.  On mental status examination ("MSE"), the doctor noted that Plaintiff was withdrawn, with an angry/frustrated mood, constricted affect, and reports of command hallucinations.  Id. at 385.

---

disorganized speech must be present "for a significant portion of time during a 1-month period or longer."  Id. (criterion numbering omitted).  "Grossly disorganized or catatonic behavior and negative symptoms may also be present."  Id. (criterion numbering omitted).

[18]In the bodies of these two treatment notes, the diagnoses are schizophrenia and borderline intellectual functioning, but in the headings, the diagnosis is "Schizoaffective disorder, Bipolar."  Tr. at 387, 389.  "Schizoaffective disorder is associated with social and occupational dysfunction, but dysfunction is not a diagnostic criterion (as it is for schizophrenia), and there is substantial variability between individuals diagnosed with schizoaffective disorder."  DSM 5 at 109.  The DSM 5 explains that "[a] wide variety of psychiatric and medical conditions can manifest with psychotic and mood symptoms that must be considered in the differential diagnosis of schizoaffective disorder."  Id. Included among the differential diagnoses are bipolar disorders with psychotic features and schizophrenia.  Id.

[19]Dr. Frankel noted that Plaintiff originally complained of depression, but the diagnosis was changed to bipolar disorder with psychosis.  Tr. at 384.

[20]Trazodone is an antidepressant.  See https://www.drugs.com/trazodone.html (last visited Feb. 1, 2023).

Plaintiff continued with regular treatment at Community Council through the latter part of 2018, when he missed several appointments. Tr. at 663-775 (treatment notes for monthly or bimonthly treatment from October 24, 2016 to February 14, 2019). The treatment notes frequently refer to Plaintiff's mother reporting on his condition, see, e.g., id. at 725 (11/13/17), 721 (12/13/17), 717 (1/12/18), and his total dependence on his mother. See, e.g., id. at 391 (2/8/16 – "limited capacity for understanding . . . total dependency in mother"), 746 (5/1/17 - "[Plaintiff] presented with his Bio-Mother as he did during the previous session as he has been diagnosed with an intellectual disability that requires the assistance of his mother to express comprehensible and truthful responses during assessments.").

As referenced, Plaintiff continued having auditory hallucinations and began suffering from insomnia in the latter part of 2016. Tr. at 769, 775. In February 2017, Dr. Beale suggested the need for inpatient treatment to get stabilized when Plaintiff was suffering from insomnia and audio/visual hallucinations, she described Plaintiff as "extremely explosive," and she listed Haldol among Plaintiff's prescriptions.[21] Id. at 765. In a treatment note from April 20, 2017, Dr. Beale noted that Plaintiff continued to suffer from insomnia, was belligerent, was "unaware of his dependent-passivity," was unable to

---

[21] Haldol is an antipsychotic used to treat schizophrenia. See https://www.drugs.com/mtm/haldol.html (last visited Feb. 1, 2023). Although Dr. Beale's notes list Haldol as one of Plaintiff's medications, it is unclear if or when it was prescribed prior to September 2017, as it does not appear in the medicines prescribed by Dr. Frankel in December 2016, tr. at 769, nor in the list of medications in May 2017 by Nurse Practitioner ("NP") James Nestor. Id. at 749.

describe past events and to process his life predicament, and "acts totally dependent on his mother and does not answer any questions or comment without checking with her." Id. at 753.  In September 2017, Plaintiff continued to have hallucinations and NP Nestor noted that Plaintiff had begun taking Haldol.  Id. at 733.  In November, Plaintiff had no hallucinations and was doing well with stable sleep.  Id. at 725.  Plaintiff continued doing well for several months.  See, e.g., id. at 709 (2/20/18 – doing well, no hallucinations, not agitated, not sad, appetite and sleep are stable), 701 (4/20/18 – stable on present medication, no issues), 687 (8/9/18 – Plaintiff "has been stable for over a year on his current medication regime.").  When he complained of "break through hallucinations," NP Nestor noted that his Haldol was increased.  Id. at 705 (3/20/18).

In December 2018, NP Nestor noted Plaintiff had missed several appointments due to family issues and had been off his medication, which led to Plaintiff "getting agitated."  Tr. at 671.  A month later, his symptoms and behaviors were noted as "Stable."  Id. at 675.

On August 19, 2019, Plaintiff sought readmission to Community Council after being discharged due to missed appointments and a six-month lapse in treatment.  Tr. at 659.  Plaintiff reported that he wanted "to get back on medications because his anger is out of control. . . .  [W]hen these rages occur, he blacks out and forgets what happens." Id.  Plaintiff's Haldol was changed to Risperdal[22] and Depakote was not restarted.  Id. at

---

[22]Risperdal (generic risperidone) is an antipsychotic used to treat schizophrenia and to treat symptoms of bipolar disorder.  See https://www.drugs.com/risperdal.html (last visited Feb,. 1, 2023).

661.[23]  In October 2019, Plaintiff was noted as "[d]oing better with the current regimen."
Id. at 653, 1085.  In December 2019, NP Nestor noted that Plaintiff had mild agitation
and mild hallucinations for which he added a second dose of Risperdal.  Id. at 1079.

Dr. Crichlow performed a consultative examination on October 18, 2019.  Tr. at
636-39.  The doctor noted on MSE that Plaintiff's speech was "intelligibility brief;" he
had paranoid thought patterns; mood and affect showed moderate anxiety, and he had
impaired sensorium.  Id. at 637-38.  Plaintiff's attention and concentration were
"[i]mpaired due to psychosis, mood instability, and potential cognitive deficits," and as
an example, Plaintiff was unable to correctly add 9 plus 3.  Id. at 638.  Similarly, the
doctor noted that Plaintiff's recent and remote memory skills were "[i]mpaired due to
cognitive and emotional difficulties," with an example that he could immediately recall 2
of 3 objects.  Id.  His cognitive functioning was borderline to impaired and his insight and
judgment were poor.  Id.  The doctor also noted that Plaintiff would not be able to
manage his own funds "due to psychosis, mood instability, and potential cognitive
deficits."  Id. at 639.

In the accompanying Medical Source Statement, Dr. Crichlow indicated that
Plaintiff had mild limitation in his ability to carry out simple instructions; moderate
limitation in his abilities to understand and remember simple instructions and make
judgments on simple work-related decisions; and marked limitation in his abilities to

---

[23]Plaintiff's mother stated that "compliance with medications is a problem," and
Plaintiff, his mother, and Courtney Kassar, an employee at Community Council,
discussed intramuscular injections.  Tr. at 659, 661.

understand, remember, and carry out complex instructions, and make judgments on complex work-related decisions.  <u>Tr.</u> at 640.[24]  In interacting with others, the doctor noted moderate impairment in the abilities to interact appropriately with the public, supervisors, and coworkers, and marked impairment in the ability to respond appropriately to usual work situations and changes in a routine work setting.  <u>Id.</u> at 641.

At the administrative hearing held on May 11, 2021, Plaintiff testified that he was not then receiving mental health treatment and was not taking any medication.  <u>Tr.</u> at 895-96 (when asked if he was getting any mental health treatment, Plaintiff responded that he lost his benefits); <u>see also id.</u> at 885 (testimony of Erin Wiggington, Plaintiff's mother).  Plaintiff explained that he cannot work because "every time I work there is always something, always somebody and I have a verbal altercation.  Every time I have been there."  <u>Id.</u> at 895.  His mother testified that Plaintiff worked at the casino in 2019-2020, but that he had conflicts with coworkers and patrons.  <u>Id.</u> at 884-85.  Plaintiff further explained that the medication he was prescribed would help, but would wear off in a few hours.  <u>Id.</u> at 896-97.  His mother stated that she believed his psychiatric medications were beginning to help him, but that he does not take them because he does not believe anything is wrong with him.  <u>Id.</u> at 885.  He testified that he has an anger issue, <u>id.</u> at 901, and his mother described incidents where Plaintiff has thrown things in

---

[24]The wording in the rating scale is slightly different from the form used by Dr. Sapol (<u>supra</u> at 8 n.8).  <u>Tr.</u> at 640.  "None" meant the patient was "[a]ble to function," "Mild" meant functioning in the area was "slightly limited," "Moderate" meant functioning in the area was "fair," "Marked" meant functioning in the area was "seriously limited," and "Extreme" meant the patient was "[u]nable to function in the area."  <u>Id.</u>

anger, breaking numerous televisions, throwing bikes, slamming down pieces of wood, and hitting walls.  Id. at 888, 900-01.

**D.    Plaintiff's Claims**

      1.    Consideration of Opinion/Mental Health Treatment Evidence[25]

Plaintiff makes a number of arguments concerning the ALJ's consideration of the opinion evidence, Doc. 6 at 4-10; Doc. 8 at 1-4.  Defendant responds generally to these arguments, noting the ALJ's compliance with her duty to consider the records.  Doc. 7 at 3-7.  I will parse out Plaintiff's arguments to address them individually.

First, Plaintiff complains that despite Dr. Sapol's assessment of a mild limitation in understanding, remembering, and carrying out simple instructions and the ALJ's conclusion that Dr. Sapol's opinion was entitled to great weight, the ALJ improperly found that Plaintiff had "no limitations in understanding, remembering, and carrying out simple instructions."  Doc. 6 at 5 (citing tr. at 344, 857).  Contrary to Plaintiff's allegation, the ALJ did not determine that Plaintiff had no limitations in understanding, remembering, and carrying out simple instructions.  In the RFC assessment, the ALJ limited Plaintiff to simple, repetitive tasks with a 1-2 reasoning level, occasional changes

---

[25]Effective March 27, 2017, the Social Security Administration amended the rules regarding the evaluation of medical evidence, eliminating the assignment of weight to any medical opinion.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because review of Plaintiff's disability status predated the effective date of the new regulations, the opinion-weighing paradigm is applicable.  Compare 20 C.F.R. § 416.927 (applicable to claims filed prior to March 27, 2017) with id. § 416.920c (applicable to claims filed on or after March 27, 2017).

in the work setting, and occasional contact with the public and coworkers.  Tr. at 857.[26]
Earlier in the decision, when addressing the Listings, the ALJ found that Plaintiff had a
moderate limitation in both understanding, remembering, and applying information, and
concentrating, persisting, or maintaining pace.  Id. at 855.  At no point did the ALJ find
that Plaintiff had no limitations in understanding, remembering, and carrying out simple
instructions.

　　　　Plaintiff also complains that the ALJ failed to address a number of other findings
in Dr. Sapol's assessment, and thereby neither adopted nor rejected them.  Doc. 6 at 6.
Defendant responds that an ALJ need not adopt all limitations identified, even if he gives
the opinion significant weight.  Doc. 7 at 3.  Defendant is correct insofar as "no rule or
regulation compels an ALJ to incorporate into an RFC every finding made by a medical
source simply because the ALJ gives the source's opinion as a whole 'significant'
weight."  Wilkinson v. Comm'r Soc. Sec., 558 F. App'x 254, 256 (3d Cir. 2014).
However, there remains a problem with the ALJ's analysis because there were a number
of limitations that the ALJ did not address, which I will mention below.  This gap leaves

---

[26]The reasoning levels referred to by the ALJ are the General Educational
Development levels used in the DOT.  Jobs with a Level 1 reasoning require the ability to
"[a]pply commonsense understanding to carry out simple one- or two-step instructions.
Deal with standardized situations with occasional or no variables in or from these
situations encountered on the job."  See DOT, Appendix C (available at
https://occupationalinfo.org/appendxc_1.html#III (last visited Jan. 20, 2023)).  Jobs with
a reasoning Level 2 require the ability to "[a]pply commonsense understanding to carry
out detailed but uninvolved written or oral instructions.  Deal with problems involving a
few concrete variables in or from standardized situations."  Id.

the court to wonder whether the ALJ disagreed with the doctor or overlooked the limitations in crafting the RFC assessment and questioning the VE.

When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as he does not "reject evidence for no reason or for the wrong reason." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)); Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1991) (same); see also 20 C.F.R. § 416.927(c)(4) ("Generally the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). The Third Circuit also requires that the ALJ provide sufficient explanation of his findings to permit meaningful review. Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000); see also Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) ("the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review").

Here, there are gaps in the ALJ's RFC assessment. For example, in their RFC assessments, the four opining doctors did not agree on the extent of Plaintiff's limitation in interacting with or accepting criticism from supervisors. See tr. at 350 (Garito – "Not Significantly Limited"), 309 (Gavazzi – "Moderately Limited"), 345 (Sapol – "Moderate"), 641 (Crichlow – "Marked").[27] The ALJ included no limitation on the

---

[27]The Mental RFC forms used by Drs. Garito and Gavazzi have a 4-point limitation sale; No Evidence of Limitation, Not Significantly Limited, Moderately Limited, and Markedly Limited. Tr. at 308, 349. The Medical Source Statement forms used by Drs. Sapol and Crichlow have a 5-point limitation scale:  None, Mild, Moderate, Marked, and Extreme. Id. at 345, 640.

ability to interact with supervisors and provided no discussion on the issue, while finding that Plaintiff should have only occasional contact with the public and coworkers.  Id. at 857.[28]  This leaves the court to ponder whether the ALJ found that Plaintiff had no limitation in the ability to interact with supervisors, adopting Dr. Garito's assessment, or simply overlooked this limitation in crafting the RFC assessment.  As previously noted, the court must determine if the Commissioner's decision is supported by substantial evidence.  Schaudeck, 181 F.3d at 431; Poulos, 474 F.3d at 91.  "This standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'"  Bailey v. Comm'r of Soc. Sec. 354 F. App'x 613, 616 (3d Cir. 2009) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).

More fundamentally, Plaintiff complains that the ALJ relied on outdated opinions in considering other evidence in the record and determining Plaintiff's RFC.  Doc. 6 at 7. The ALJ considered and gave "great weight" to the 2013 assessments of Dr. Sapol, an examining consultant, and Drs. Gavazzi and Garito, who conducted record reviews, despite the fact that in 2013 Plaintiff had not begun mental health treatment and the record contained only an IEP and scant medical records related to a diagnosis of ADHD. Tr. at 861-63.  It was not until after these assessments that Plaintiff began treatment at Community Council, received diagnoses of mood disorder, NOS, changed to schizophrenia/schizoaffective disorder, bipolar type, and was treated with antipsychotic

---

[28]The doctors also did not agree on Plaintiff's limitations including interaction with co-workers, but the limitations they found were identical to their findings regarding supervisors, with the exception that Dr. Garrito found Plaintiff "Moderately Limited." Tr. at 350, 309, 345, 641.

medications and counseling.  Dr. Crichlow, the examining consultant who provided a Medical Source Statement in 2019, determined that Plaintiff was significantly more limited than did the doctors examining Plaintiff and reviewing the records in 2013. Compare id. at 344 (Sapol – 9/18/13), 308-09 (Gavazzi – 9/27/13), 349-50 (Garito – 12/9/13) with 640-41 (Crichlow – 10/18/19).[29]  The ALJ gave Dr. Crichlow's opinion "partial weight" because the doctor "overly relied on [Plaintiff's] subjective complaints" and did not take into account treatment notes suggesting Plaintiff's symptoms had improved.  Id. at 862.

With respect to the time gap between the opinions, Defendant relies on Chandler v. Commissioner of Social Security in arguing that "[t]he Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it."  Doc. 7 at 6 (quoting 667 F.3d 356, 361 (3d Cir. 2011)).  Chandler is distinguishable from this case.  The consultative report in Chandler predated the new records by "at most, a few years," the new records "tracked [the plaintiff's] injury and deterioration during the time periods surrounding her disability onset date," and the plaintiff did not argue that the new records would have altered the consultant's opinion. 667 F.3d at 360-61 & n.3.  Here, the reports upon which the ALJ relied were nearly eight years old at the time of the ALJ's consideration of the case.  Those reports were based solely on a diagnosis of ADHD, an IEP, and scant treatment evidence.  See tr. at 340 (Dr.

---

[29]At the time of his Disability Evaluation, Dr. Sapol noted that he also reviewed the treatment notes from "an office visit and progress note dated March 11, 2013."  Tr. at 340.

Sapol noted the only information available for his review was "an office visit and progress note dated March 11, 2013), 310 (Dr. Gavazzi noting diagnosis of ADHD with no hospitalizations, psychotropic agents, or psychotherapy), 351 (Dr. Garito noted treatment for ADHD in the past with no medication for a mental problem nor any counseling). These three consultants were unaware of Plaintiff's subsequent mental health diagnoses as well as his therapy and treatment. "ALJ's may not rely on outdated opinions of agency consultants 'if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.'" Kibe v. Berryhill, Civ. No. 18-228, 2019 WL 1226723, at *5 (W.D. Pa. Mar. 15, 2019) (quoting Lambert v. Berryhill, 896 F.3d 768, 776 (7th Cir. 2018); Moreno v. Berryhill, 882 F.3d 722, 728 (7th Cir. 2018)). Here, the intervening mental health diagnoses and treatment undermine the earlier reports which were based on a diagnosis of ADHD and scant treatment records.

The ALJ's consideration of Dr. Crichlow's opinion lacks substantial evidence for an additional reason.[30] As noted, the ALJ gave only partial weight to Dr. Crichlow's opinion because it was based on Plaintiff's complaints and inconsistent with more recent reports from Plaintiff's treating mental health providers whose notes indicate that Plaintiff had no current problems.

---

[30]When the Appeals Council last remanded the case, after the second uncontested remand request filed by Defendant in this court, it did so with instruction to reconsider Dr. Crichlow's opinion, noting that, in the prior decision, the ALJ discredited Dr. Crichlow's opinion, in part because she had examined Plaintiff only once, yet the ALJ credited the opinion of Dr. Sapol, who also only examined the Plaintiff once. Tr. at 944.

> Dr. Crichlow overly relied on [Plaintiff's] subjective
> complaints – even after opining that he was an unreliable
> historian – and overestimated [Plaintiff's] limitations.
> [Plaintiff's] treating therapist and psychiatrist, Mr. Brumskill
> and Dr. Bautista, noted that [Plaintiff] has a "history of
> impaired functioning due to symptoms of anxiety and
> depression relative to schizoaffective disorder bipolar type,"
> in the same treatment note they indicated that [Plaintiff]
> "reports no current problems interfering with functioning["]
> ([tr. at 1077, 1083]).  This suggests that [Plaintiff's] condition
> had improved over time, such that while his symptoms
> interfered with his functioning in the past, they had improved
> such that they no longer interfered with his functioning ([id.
> at 1077]).

Tr. at 862.[31]

Thus, while discrediting Dr. Crichlow's opinion because it was based on

Plaintiff's complaints, which were unreliable, the ALJ credited the notations of Mr.

Brumskill and Dr. Bautista, which were also based on Plaintiff's subjective reports.

Earlier treatment notes indicate that Plaintiff "requires the assistance of his mother to

express comprehensible and truthful responses during assessments" tr. at 746 (5/1/17),

and his mother's presence is not noted in the assessments relied upon by the ALJ.  Id. at

1077 (12/10/19), 1083 (10/17/19).  The same day that Mr. Brumskill noted "participant

reports no current problems interfering with functioning," id. at 1077 (12/10/19), NP

Nestor noted that mild agitation and mild hallucinations persisted, for which he added a

daytime dose of risperidone.  Id. at 1079.  Plaintiff's caregiver is noted as participating in

---

[31]It is unclear to whom Plaintiff made the statement because the cited Treatment
Plans dated October 17 and December 10, 2019, indicate that they were prepared by Mr.
Brumskill, but bear the signature of either Dr. Bautista or both clinicians.  Tr. at 1076-78,
1082-84.

this session.  Id.  Thus, I conclude that the ALJ discredited Dr. Crichlow's opinion for the

wrong reason.  It is inconsistent for the ALJ to rely on the unreliability of Plaintiff's

complaints to Dr. Crichlow, and the reliability of his complaints to other clinicians, both

for the purpose of rejecting Dr. Crichlow's opinions, at least not without further rationale

for doing so.

In addition, the ALJ concluded that Dr. Crichlow "overly relied on [Plaintiff's]

subjective complaints – even after opining that he was an unreliable historian – and

overestimated [Plaintiff's] limitations."  Tr. at 862.  This conclusion overlooks the fact

that Dr. Crichlow examined Plaintiff and conducted an MSE, in which she noted that

Plaintiff had paranoid thought patterns, his sensorium was impaired, he did not know the

date, his insight and judgment were poor, his recent and remote memory were impaired,

and his cognitive functioning was borderline to impaired.  Id. at 638.

Moreover, the period at issue begins in June 2013, when Plaintiff turned 18.  The

ALJ noted that both Mr. Brumskill and Dr. Bautista concluded that Plaintiff has a

"history of impaired functioning due to symptoms of anxiety and depression relative to

schizoaffective disorder bipolar type," but reported no current problems with functioning

in October and December 2019.  Tr. at 862 (quoting id. at 1077, 1083).  However, the

ALJ failed to consider whether that impaired functioning during the relevant period was

sufficient to establish Plaintiff's disability, even for some period of time in the interim.

Plaintiff also complains that the ALJ's description of Plaintiff's mental health

treatment as "minimal" is a mischaracterization.  Doc. 6 at 8 (quoting tr. at 862).

Defendant responds that the ALJ acknowledged Plaintiff's receipt of outpatient services,

noting that he was never hospitalized, and that "his reported psychotic symptoms, likely would result in more intensive psychiatric treatment if warranted." Doc. 7 at 6. I agree with Plaintiff on this point. Once Plaintiff sought mental health treatment, he was diagnosed with mood disorder, NOS, which diagnosis changed to schizophrenia and schizoaffective disorder bipolar type. Tr. at 369 (mood disorder), 387, 389 (schizophrenia and schizoaffective disorder bipolar type). He was treated with various combinations of Haldol, Risperdal, Depakote, Seroquel, and trazodone. See id. at 384, 661, 765. Such treatment is inconsistent with a conclusion that the treatment is minimal. See Cordero v. Kijakazi, 597 F. Supp.3d 776, 799 (E.D. Pa. 2022) (ALJ's conclusion that treatment was routine and conservative was not supported by substantial evidence when claimant was treated with psychotropic medications and no medical source characterized such treatment as minimal), Hull v. Berryhill, Civ. No. 18-6, 2018 WL 3546555, at *10 (M.D. Pa. July 24, 2018) (ALJ's labeling of treatment as conservative was not supported where claimant attended group and individual therapy and was on numerous mental health medications); Thomas v. Colvin, Civ. No. 15-876, 2016 WL 4537065, at *3 (W.D. Pa. Aug. 30, 2016) (rejecting characterization of mental health treatment as limited and conservative where claimant took psychiatric medications and consistently treated with mental health professionals). Thus, I conclude that the ALJ's characterization of Plaintiff's treatment does not support his conclusion.

Plaintiff also complains that the ALJ impermissibly relied on Plaintiff's failure to follow prescribed treatment without considering the reasons for Plaintiff's noncompliance, specifically the nature of Plaintiff's mental illness. Doc. 6 at 9.

Defendant responds that the ALJ "did not make any adverse inferences based on non-compliance but merely pointed out that even when noncompliant, Plaintiff's functioning was considered improved by his providers." Doc. 7 at 6. It is unclear to what extent, if any, the ALJ considered Plaintiff's discontinuation of treatment. The ALJ noted compliance issues during Plaintiff's treatment, tr. at 860, and twice mentioned his discontinuation of treatment, id. at 858, 860, once noting that it was due to a lack of insurance. Id. at 858. Having already determined that the ALJ's treatment of the medical opinions is not supported by substantial evidence, I need not delve into the ALJ's consideration of Plaintiff's compliance with prescribed treatment.

2.   Conflicts Between the VE Testimony and the DOT

Plaintiff next complains that the ALJ failed to identify and resolve conflicts between the VE's testimony and the DOT. Doc. 6 at 10-13; Doc. 8 at 5-6. Specifically, Plaintiff argues that the occupation of dog bather would be precluded based on its required reasoning level and because it requires "dealing with people." Id. at 11-12. According to Plaintiff, the stable attendant job would conflict with the ALJ's restrict to only occasional changes in work setting, and the stores laborer job required driving. Id. at 122. Although Defendant concedes that the reasoning level of the dog bather job conflicts with the ALJ's RFC assessment, Doc. 7 at 7, she argues that the RFC assessment does not preclude the jobs of stable attendant and stores laborer. Doc. 7 at 7-8.

Because I have determined that the ALJ's decision is not supported by substantial evidence, I need not address any conflicts between the VE testimony and the DOT.[32]

**E.      Remedy**

After two prior court remands based on Defendant's uncontested motions, three hearings and three ALJ decisions, and a delay of nearly ten years, Plaintiff asks the court to remand the case for an award of benefits.  Doc. 6 at 13-16; Doc. 8 at 6.  Defendant argues that should the court find that the ALJ's decision is not supported by substantial evidence, the proper remedy is remand for further consideration of the treatment record, rather than an award of benefits.  Doc. 7 at 9-10.

The governing statute provides that the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g) (sentence four).  Thus, the court has discretion to award benefits.

An "award [of] benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits."  Podedworny v. Harris,

---

[32]Plaintiff also claims that the government deprived her of a valid administrative adjudicatory process based on the Supreme Court's decision in Seila Law LLC v. CFPB, 140 S.Ct. 2183 (2020).  Doc. 6 at 16-18.  Although Defendant agrees that the appointment of the Commissioner at the time of the ALJ's decision violated the separation of powers, Defendant contends that this does not entitle Plaintiff to a rehearing of her claim.  Doc. 7 at 10-12.  Again, in light of my ruling on the merits of the ALJ's decision, I need not address this issue.

745 F.2d 210, 221-22 (3d Cir. 1984).  "The Court of Appeals has held that where there

has been inordinate delay, coupled with an existing record that contains substantial

evidence supporting a finding of disability, a reversal with direction to award benefits is

appropriate, rather than a remand for further proceedings."  Cordero v. Kijakazi, 597 F.

Supp.3d 776, 821 (E.D. Pa. 2022) (citing Morales v. Apfel, 225 F.3d 310, 320 (3d Cir.

2000)).  In Morales, the Third Circuit found that an award of benefits was appropriate

because "[t]he disability determination has already taken ten years and the record is

unlikely to change."  225 F.3d at 320.  Similarly, in determining whether to remand a

case for further consideration or for the award of benefits, the Honorable Martin Carlson,

my colleague in the Middle District, summarized the factors relevant to the court's

consideration.

> [A]ny decision to award benefits in lieu of ordering a remand
> for further agency consideration entails the weighing of two
> factors:  First, whether there has been an excessive delay in
> the litigation of the claim which is not attributable to the
> claimant; and second, whether the administrative record of
> the case has been fully developed and substantial evidence
> on the record as a whole indicates that the claimant is
> disabled and entitled to benefits.

Diaz v. Berryhill, 388 F. Supp.3d 382, 391 (M.D. Pa. 2019).

Weighing both factors in light of the record here, I conclude that an award of

benefits is appropriate.  As previously noted, adjudication of Plaintiff's claim has been

delayed nearly ten years.  Plaintiff's child benefits ended in the end of 2013, he has had

three hearings and three ALJ decisions (in 2016, 2019, and 2021), and Defendant has

twice requested this court to remand the case for further consideration.  There is no suggestion that Plaintiff is responsible for any portion of the delay.

The record is also sufficient to support an award.  When the Appeals Council last remanded the case to an ALJ after I granted Defendant's most recent uncontested remand motion, it noted that "[t]he hearing decision does not contain an adequate evaluation of Dr. Crichlow['s opinion]."  Tr. at 944.  Specifically, the Appeals Council noted that the prior ALJ discredited Dr. Crichlow's opinion because the doctor relied on Plaintiff's reported symptoms and because Dr. Crichlow had examined Plaintiff only once, while the ALJ relied on another consultative examiner who also examined Plaintiff only once. Id.  On remand, the ALJ did the same thing and compounded that error.  Id. at 862. Again, the ALJ concluded that Dr. Crichlow relied on Plaintiff's subjective complaints and ignored the doctor's findings on MSE.   The ALJ bolstered her argument by relying on treatment notes indicating that Plaintiff was doing well, which were based on Plaintiff's subjective complaints, or lack thereof.  See supra at 24-25.

As previously noted, the opinions upon which the ALJ relied predate any mental health diagnoses or treatment when Plaintiff had a diagnosis of ADHD and scant treatment when he was in high school.  Since that time, Plaintiff was diagnosed with mood disorder when he began treatment at Community Council, characterized by episodes of anger and auditory hallucinations.  E.g., tr. at 369 (1/8/15), 360 (2/26/15), 358 (3/26/15), 355 (5/28/15).  Plaintiff was later diagnosed with bipolar disorder with psychosis with auditory hallucinations, paranoia, and agitation, id. at 384 (6/6/16),

schizoaffective disorder, bipolar type with symptoms of anger, and audio and visual hallucinations.  E.g., id. at 387 (11/17/15), 733 (9/15/17).

Plaintiff's treatment providers have noted that "[he] has a history of impaired functioning due to symptoms of anxiety and depression relative to Schizoaffective disorder, Bipolar type," tr. at 684 (9/14/18), and he "has a chronic psychiatric disorder that has impaired him much of his life."  Id. at 696 (4/20/18).  The only doctor to have completed an RFC assessment after Plaintiff began mental health treatment (Dr. Crichlow) conducted an evaluation and found multiple abnormalities on MSE and found primarily moderate and marked limitations in every category about which she was asked to rate his functioning.  Id. at 640-41.  As previously discussed, the ALJ's rejection of this opinion was flawed.  Defendant has already been given an opportunity to correct the ALJ's flawed consideration of this opinion and did nothing more than compound the error.  Therefore, remand for an award of benefits is called for.

## IV.    **CONCLUSION**

The ALJ's consideration of the mental health treatment evidence is flawed.  First, the ALJ's decision is silent regarding Plaintiff's limitations in activities about which the medical opinions diverged from one another.  Next, the ALJ mischaracterized Plaintiff's mental health treatment as minimal because he was not hospitalized, despite mental health diagnoses of mood disorder, bipolar disorder with psychosis, and schizoaffective disorder, bipolar type, and treatment with antipsychotics.  More importantly, the ALJ erred in rejecting Dr. Crichlow's opinion.  In doing so, the ALJ overlooked the doctor's findings on MSE and relied on the findings of a consultative examiner and record reviews

31

predating Plaintiff's mental health diagnoses and treatment.  Moreover, the ALJ

discredited Dr. Crichlow's opinion as based on Plaintiff's subjective complaints and

found her opinion inconsistent with the mental health treatment notes.  However, those

treatment notes were also based on Plaintiff's subjective complaints.

After considering the record as a whole and the multiple remands of the case,

delaying adjudication of Plaintiff's claim for nearly ten years, I remand the case for the

award of benefits.

An appropriate Order and Judgment Order follow.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AARYN NYJJIRH LOFTON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-4284 |
| Commissioner of Social Security | : | |

## O R D E R

AND NOW, this  14th  day of February, 2023, upon consideration of Plaintiff's

request for review (Doc. 6), the response (Doc. 7), Plaintiff's reply (Doc. 8), and after

careful consideration of the administrative record (Doc. 5), for the reasons stated in the

accompanying memorandum, IT IS HEREBY ORDERED that:

1. Judgment is entered REVERSING the decision of the Commissioner of Social
   Security.

2. The relief sought by Plaintiff is GRANTED and the matter is REMANDED to
   the Acting Commissioner of Social Security for an award of benefits,
   consistent with the accompanying memorandum.

3. The clerk of Court is hereby directed to mark this case closed.

/s/ Elizabeth T. Hey

_____

ELIZABETH T. HEY, U.S.M.J.